## McGuire & Fetzer *versus* Faber *et al.*

Where the vendors of land transferred the amount due on the article of agreement to a firm, in trust, to receive and pay over the instalments to certain creditors of the vendors, named in the transfer, neither the vendors nor their creditors will be affected by any fraudulent contrivance between one of the trustees and the vendees, in which they did not participate. .

Where one of the trustees under such transfer, purchased at sheriff's sale the personal property of the vendees, and operated a furnace belonging to them, under an arrangement that the profits should be applied to the debts of the vendees, a purchaser at sheriff's sale of the vendees' interest under the agreement cannot set off such profits, against the purchase-money due on the agreement, without showing an actual appropriation of them to that claim.

A purchaser at sheriff's sale of a vendee's interest in land does not stand in the very shoes of the vendee; for the latter may set off against the vendor independent debts, but the purchaser can only set off what was directly or indirectly given and received as payment.

Letters, written by one who was the clerk of a party, not relating to the general business in which he was employed as clerk, must be taken to contain merely the declarations of a third person, until they are proved to have been written by the directions of the party.

ERROR to the Common Pleas of *Clarion county.*

The action was ejectment, and was instituted to recover the balance of purchase-money due on an article of agreement.

The land in controversy was a tract of 82 acres, situated in Washington township, Clarion county, and on which " Hemlock Furnace" was erected. McGuire & Fetzer were the owners of the land, and operated the furnace; and on the 19th of August, 1848, entered into an article of agreement with John Horner and James Eaton for the sale of the real and personal estate belonging to said furnace, for the consideration of $10,841.37, payable as follows : $500 on the signing of the agreement, $5000 on the 1st of May, 1849, and $1500 annually thereafter until the whole should be paid. The agreement also provided that certain cordwood, which was cut but not taken up or measured, should be included, in addition, in the last payment. It was afterwards ascertained to amount to $179.20, making the whole purchase-money $11,020.57.

The amount payable presently, and the payment due on the 1st of May, 1849, are receipted on the agreement.

On the 24th of August, 1848, McGuire & Fetzer assigned all their interest in the said article of agreement to Breading, Arnold, & Hogg, in trust for various creditors of McGuire & Fetzer.

[McGuire *v.* Faber.]

The following is the assignment endorsed upon the agreement:—

"For value received we do hereby assign, transfer, and make over to Breading, Arnold & Hogg, all our right, title, interest, and claim, of, in, and to the within article of agreement, in trust for our creditors, viz., Breading, Shipton & Hogg, Breading, Arnold & Hogg, R. Dalzell & Co., Walker & Woodwell, John Walker, R. Tanner & Co., C. H. Kay & Co., George Breed, McCord & Co., and William Henderson, to receive the payments as they become due, and divide the same among the said creditors, *pro rata.* Witness our hands and seals the 24th day of August, 1848."

The article and the assignment on it were recorded on the 1st September, 1848, in the recorder's office of Clarion county. This suit was brought for the use of the creditors named in the assignment, against Horner & Eaton and F. & W. M. Faber, to December Term, 1852.

On the part of the defendants was shown a judgment against Horner & Eaton to May Term, 1851, the premises levied and condemned, and, on the 10th September, 1852, sold to F. & W. M. Faber, for the sum of $50, and a sheriff's deed acknowledged to them. They also showed a receipt of James E. Breading, dated 21st November, 1850, for $1500—the instalment due on the 1st of May, 1850—and a distribution, *pro rata,* among the creditors. They further showed, under exception, a judgment, entered to May Term, 1851, in the Common Pleas of Venango county, in favour of Breading, against John Horner, for $2104. Also a judgment in the Common Pleas of Clarion county, for the sum of $2975.25, entered in June, 1851; and that executions were issued on these judgments, and Horner's personal property in both counties was levied, and that at and before the sale it was agreed that Breading should bid in the property and hold it for Horner's use till the judgments were satisfied. The instalment due on the agreement on 1st May, 1851, was included in these judgments. They also proved that, soon after the assignment of the agreement, the firm of Breading, Arnold & Hogg was dissolved by the decease of Hogg and Arnold's withdrawal, and that Breading settled the affairs of the firm. They also proved, under exception by plaintiffs, that the personal property of Horner & Eaton was sold on the 24th and 25th June, 1851; that the witnesses were prevented from bidding on it, by being told by Horner, and by Douglas, who was the agent of Breading, that the property was to be bid in for the use of Horner, and, as soon as his debts were paid, was to be his; that Breading became the purchaser of the said personal property greatly below its value, and carried on the furnace till January, 1853; and that he realized sufficient out of the proceeds of the property and the

[McGuire *v.* Faber.]

furnace to pay the debts of Horner, including the purchase-money due on the agreement.

Fabers, the defendants, contended that the circumstances given in evidence were a fraud upon the creditors of Horner & Eaton, committed by Breading & Horner; and that the various amounts received by Breading, through the sheriff's sale and the proceeds of the furnace up to January, 1853, were sufficient to pay all the creditors, and must be so applied.

The plaintiffs denied the existence of any fraud, and contended that, even if there were, the other creditors, for whose use the agreement was assigned, were not cognisant of and did not participate in its perpetration; that, if the moneys received by Breading were received for Horner's use, there had been no application or appropriation of them to the payment of this claim, and they remained in Breading's hands, subject to the attachments of such creditors as had or would pursue them, and did not oust the plaintiffs of their right to enforce the payment of the unpaid purchase-money in this ejectment.

The Court below (GALBRAITH, P. J.) concurred in the views entertained by the defendants, and, under the instructions of the Court, the jury found a verdict for them.

The plaintiffs thereupon took this writ of error.

*A. W. Loomis, Purviance,* and *Campbell,* for plaintiffs in error. —All the creditors, and each of them, had distinct and independent interests. McGuire & Fetzer, after the assignment, could do nothing to impair or destroy these interests. Neither could the trustees, Breading, Hogg & Arnold, or any of them, discharge those interests without having received *actual* payment. No action, or even fraud of one or more of the creditors, could affect or impair the rights of the others. The power and authority of the trustees were limited to receiving and dividing the payments among the designated creditors: 2 *Atk.* 120; 2 *Bro.* 656; 1 *Johns. Ch. R.* 16; 2 *P. Wms.* 453; 3 *Atk.* 441; 1 *Harris* 589; *Lew. on Tr.* 265; *Willes* 136; 19 *Vesey* 463; 8 *W. & Ser.* 405; 9 *W. & Ser.* 56; *Story on Agency* 46–7; 9 *Watts* 466; 6 *Ser. & R.* 170; 8 *Watts* 128; 10 *Barr* 519.

*J. E. Brady, Corbett,* and *Sutton,* for defendants in error.—We think the charge of the Court will sustain itself. The facts were fairly submitted to the jury. Would the property of Horner & Eaton, at a fair sale, have sold for an amount sufficient to satisfy all the executions? This was submitted to the jury, and they have so found. The $1500 due on the agreement was included in these judgments and executions.

Breading had undertaken to collect the amount, and having

[McGuire *v.* Faber.]

included it in the judgments, if lost through his fault, he was responsible for it. The levy was a satisfaction: 8 *Harris* 46–49. If he colluded with the debtor, whereby the property sold under its value, it was equally a satisfaction: 4 *Harris* 55–58; 4 *Watts* 362.

The opinion of the Court was delivered by

LOWRIE, J.—A balance of purchase-money of about $4000 being due by Horner & Eaton to McGuire & Fetzer, on a sale of the Hemlock Furnace, they assigned it to Breading, Arnold & Hogg to collect, and apply to certain specified debts due to themselves and others. Afterwards, on the 10th of September, 1852, F. & W. M. Faber acquired the equitable title of Horner & Eaton at sheriff's sale, and on this ejectment being brought to enforce the payment of the balance of the purchase-money, they attempt to show payment thereof by Horner.

It is a little strange that their effort to show this starts from the assumption that there was a fraudulent conspiracy between Breading & Horner to cheat Horner's creditors, by getting all his personal property transferred to Breading by means of judgments and executions, and that, in this way, Breading got funds enough in his hands to pay this whole claim. Suppose it so, does that pay it?

Be it remembered that all that transaction, being a fraud upon creditors, is good for nothing against them, and therefore they cannot suffer by it. If anybody suffers it must only be the supposed fraudulent conspirators, Breading and Horner. Even the creditors of Horner, who were intended to be favoured by it, if there were any, cannot be injured by it unless they were parties to it. McGuire & Fetzer had no hand in it, and cannot be charged with such a fraud concocted by one of their assignees. They want this money collected so that the debts, to which they have appropriated it, may be paid. If the transaction was fraudulent, then Breading stands as trustee for all the creditors for such amount of Horner's effects as he thus got into his hands, or for such creditors as may pursue it by due course of law.

Certainly when Fabers bought the furnace, they acquired no title to this money in the hands of Breading, and, whatever they may do as creditors, they have no sort of right, as purchasers, to interfere with Breading's disposal of it. The decision that has been made of the case, however, takes the money of the creditors and gives it to an entire stranger, and thus the law is made to turn the fraud on them to his profit, and leaves them in a worse condition than they would have occupied if no cry of fraud had been raised on their behalf.

Suppose, however, as it was assumed below, that McGuire & Fetzer and their creditors are chargeable with the fraud of their

[McGuire *v.* Faber.]

assignee, Breading, in combining with Horner to cheat his creditors; if, in such a case, we treat the money as being in Breading's hands for the use of McGuire & Fetzer, as was done here, then we give the fraudulent parties the benefit of their fraud, and cast the crumbs to the honest creditors, for the law does not require even defrauders to do more than disgorge, and it will do no more with Breading. These views show plainly enough that there was error in every step of this trial.

We may now say that we discover no evidence in the cause that can at all justify the charge of fraud; and, as the plaintiff did not make it, and the defendants have no longer any interest in insisting on it, we may pass by all else that has been said on that subject, and notice the other questions, which must, so far as relevant, relate to the fact of payment of the balance of the purchase-money.

Fabers do not stand in the very shoes of Horner, for he might set off independent debts, so as to have the effect of payment, whereas they can show no more than what was directly or indirectly given and received with the intention of payment; for, in buying the land, they acquired no title to any debts due to Horner, or Horner & Eaton. On this principle it appears plain to us that, so far as any money was made upon the executions of Breading against Horner, it must be applied *pro rata* to the several interests represented by those judgments, unless there was an agreement to the contrary. If these judgments included an instalment of the purchase-money, then this principle applies to it. Breading having a right to collect the money, could do it in this way provided McGuire & Fetzer should not suffer by the arrangement.

If beyond this there was an arrangement between Breading and Horner, by which Horner was to have the profits of running the furnace, then those profits cannot be applied to the purchase-money, unless there was an agreement for that purpose, and they were actually so applied by Breading or Horner. The law will not apply it to relieve the purchaser at the sheriff's sale, and to the prejudice of creditors. It would be a monstrous result if it should be applied so as to give this furnace property for $50, while most of the creditors remain unpaid. A mere agreement so to apply it would give Horner a right of action to enforce it, or his rights under it might be attached by creditors; but it is merely executory until actual application.

This is a suit of McGuire & Fetzer against Horner and Eaton, and we cannot enforce it so as to settle the account of the speculation entered into by Breading and Horner. Breading, as assignee of McGuire & Fetzer, has no power to draw them and their creditors into his plans for setting up Horner in business, and he did not intend to. And the purchaser of Horner and Eaton's land is not entitled, when sued for the purchase-money,

[McGuire *v.* Faber.]

to claim an account of what Breading owes Horner, and to turn that over as payment.

These views seem to us to meet all the points insisted on in the argument, except the one relative to the letters written by Douglas in the name of Breading, and that seems to be unimportant now. We may say, however, that they must be considered as containing merely the declarations of a third person, until it is proved that they were written under the direction of Breading.

Judgment reversed and a new trial awarded.